# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 13, 2013 Session

## STATE OF TENNESSEE v. KEVIN CLARK

### Appeal from the Criminal Court for Overton County
### No. 7021    Leon Burns, Judge

### No. M2012-01744-CCA-R3-CD - Filed November 21, 2013

The defendant, Kevin Clark, appeals his Overton County Criminal Court jury convictions of two counts of first degree murder, aggravated arson, abuse of a corpse, reckless endangerment, and two counts of aggravated assault. In this appeal, the defendant contends that the trial court erred by admitting into evidence the videotaped deposition of a State's witness in lieu of live testimony, that the trial court erred by admitting evidence of forensic testing conducted on the defendant's shoes and clothing, and that the evidence was insufficient to support his convictions of first degree murder. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Michael R. Giaimo, Cookeville, Tennessee, for the appellant, Kevin Clark.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall A. York; District Attorney General; and Mark Gore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant's convictions relate to events that transpired on May 13, 2009. At trial, the defendant's ex-wife, Susan Beth Clark, testified that in May 2009, she and the defendant lived in a house on property that adjoined property owned by the defendant's mother, Vida Clark, one of the homicide victims in this case. She recalled that when she returned home from work at approximately 5:30 p.m. on May 12, 2009, "[t]here was a fence across the driveway that had yellow bags on it." She said that no secondary driveway

provided access to her home and that the driveway blocked by the fence was the only way to her house. In consequence, the sight of the fence made her "physically ill," and she was forced to "drive up a field" to get to her house, nearly damaging her car. Susan Clark said that she did not immediately wake the defendant, who was sleeping because he worked third shift, but instead set about cleaning the kitchen. At one point, she went "to the back field" to scrape out scrap food and overheard Vida Clark, Roy Clark, the other homicide victim, and Sharon Miller "whispering and snickering and laughing." Susan Clark testified that she believed that the trio wanted her to wake the defendant and tell him about the fence, so she did not do it. She said that, instead, she woke him up at 9:00 p.m. as she usually did. At that point, she told him about the fence, and the defendant responded, "'You're kidding.'" He then telephoned Jerry Clark, and after he finished his conversation, he said, "'I can't worry about it. I've got to go to work.'" Susan Clark maintained that the defendant was not mad or upset but that he "just seemed real puzzled."

According to Susan Clark, when the defendant returned from work in the morning, he told her that he needed to mow a neighbor's yard before the rain and that he could not "'deal with this today.'" She said that she told him that they could discuss the matter of the fence with her brother, an attorney, when she finished her shift at work. The defendant agreed, and she left for work. Susan Clark testified that the defendant telephoned her at 6:35 a.m., and he was "not in his right self." The defendant said to her, "'It's been took care of. I've called the fire department and the police department.'" He then said, "'They're not going to take me alive.'" Terrified, Susan Clark telephoned Jerry Clark, "and he said he didn't want to go up there." She then telephoned the defendant's friend and pastor, Kevin Phillips, and asked him to investigate.

During cross-examination, Susan Clark testified that the defendant made no threats toward Roy and Vida Clark. She said that Roy Clark, the defendant's younger brother, lived with Vida Clark. She said she had not seen the defendant fight with Roy Clark, but she had seen Roy Clark "stare [the defendant] down" and had seen Roy Clark tell Vida Clark "that [the defendant] was staring at him, when in fact [the defendant] wasn't staring at him."

The defendant's older brother, Jerry Clark, testified that the defendant had lived next door to their mother for "eight or ten years" on property that Jerry Clark had sold to the defendant. Their younger brother, Roy Clark, lived with their mother. On May 12, 2009, the defendant telephoned Jerry Clark and told him that Vida and Roy Clark had placed a fence across his driveway. He said that he suggested that the defendant complete a driveway that he had started to build on another part of the property to avoid trouble. The defendant said that he should be permitted to use the existing driveway and indicated an intent to hire a lawyer to investigate the issue. After Jerry Clark said, "Well, do whatever

you need to do," the defendant responded, "'I believe I'm just going to take care of this myself.'" Jerry Clark said that he encouraged the defendant a second time to use the other driveway, and the defendant again said he would "take care of it."

Jerry Clark testified that, on the following morning, Susan Clark telephoned him, and, in response to her call, he went to his mother's house. When he arrived, "[i]t was in flames." He said that he also saw his mother lying in the driveway. Jerry Clark said that no one else was around, so he "[k]indly got [him]self out of sight" until emergency personnel arrived.

During cross-examination, Jerry Clark acknowledged that the driveway he had suggested the defendant use was not finished. In the rain, that driveway would not have been passable. He acknowledged that, as executor of his mother's estate, he had sued the defendant for $1 million.

The video-recorded deposition of State witness William Brockette and an accompanying transcript were tendered as exhibits over the defendant's objection. In the deposition, Mr. Brockette testified that he had worked with the defendant on the third shift sanitation crew at the Perdue Farms chicken processing plant in Monterrey. On May 12, 2009, the defendant told Mr. Brockette about an altercation with the defendant's brother "about a fence [that] had been put up across the driveway." The defendant told Mr. Brockette that "if that fence was still up when he got off work that morning and went home, that he was going to kill him." Mr. Brockette said that he did not take the threat seriously, believing the defendant was "just blowing off some steam." He said that the defendant was "very frustrated" about the fence. Mr. Brockette said that he told the defendant to telephone an attorney to deal with the situation and provided him with the name of an attorney. The defendant told Mr. Brockette that "it just burns him up . . . how his brother acts." According to Mr. Brockette, the defendant said that his mother had "always taken up for Roy, and Roy . . . can't do anything wrong, and she's always got excuses for things that he does." Mr. Brockette said that "[i]t seems like there was a . . . lot of frustration from past years, you know, that had boiled up to . . .what happened." Eventually, the men began to work, and the defendant did not mention the fence again. Mr. Brockette remembered that the defendant left before 5:00 a.m. on the following morning, explaining that the defendant had intended to buy a weed-eater from Mr. Brockette but forgot the weed-eater in Mr. Brockette's truck. Mr. Brockette said that when he saw that the weed-eater was still in his truck, he tried to call the defendant, but the defendant did not answer.

On May 13, 2009, the defendant's mother, Vida Clark, telephoned 9-1-1 and reported that her son had come to her residence at 141 Hassler Road in Overton County and had shot "both" of them. She told the 9-1-1 operator her arm "is about blowed off" and then

made no other sound. The operator dispatched police to the scene.

Near that same time, neighbors Jewel Belle Melton and Paul Walker saw smoke coming from the residence at 141 Hassler Road. Ms. Melton testified that she was on her front porch when she saw 141 Hassler Road "go shebang." She said that she thought the house "probably caught on fire, blowed up or something." Ms. Melton recalled that shortly before the house burned, the defendant telephoned her and asked if she knew "that fence was up down there." She said that she told him that she did and said that Vida Clark had told her about the fence. She testified that the defendant said, "God bless you," and hung up the phone. Mr. Walker testified that he was awakened by gunshots at approximately 6:30 or 7:00 a.m. He said it sounded as though the shots had come from Vida Clark's residence. He said he telephoned a neighbor, who said that he had not heard any shots. Mr. Walker said that he later heard more shots. He then went to make coffee, and when he returned to the window, he saw smoke coming from Vida Clark's residence.

Overton County Sheriff's Department Sergeant Robert Garrett and Deputy Derrick Ledbetter responded to Vida Clark's 9-1-1 call. Parking several hundred yards away from the residence due to the nature of the call, the officers used tree cover as they made their approach to the house because they had been advised that the shooter was still on the scene. Sergeant Garrett testified that as they approached the house, he encountered some individuals who told him there was a body near the house. Sergeant Garrett observed the body lying three or four feet from the house, and after clearing the area, he and Deputy Ledbetter dragged the body away from the flames. He said that the house was fully engulfed in flames.

After setting up a perimeter and waiting for other officers, Sergeant Garrett and those officers made their approach toward the defendant's house. As they approached, they saw the defendant standing in the doorway of his back porch with a camouflage colored rifle in his hand. The defendant, who appeared to be wearing a field jacket, ordered the officers to fall back. They initially fell back but then took another path toward the defendant's house. Sergeant Garrett recalled that as he began to cross a fence, he heard "what sounded like two .22 shots." Deputy Ledbetter "came across and was turning to cover for" Deputy John Mackey[1] when Sergeant Garrett heard a "louder boom, that came from a larger caliber." At that point, Deputy Ledbetter "grabbed his shoulder and hit the ground and said, 'I've been hit.'" Sergeant Garrett removed Deputy Ledbetter's shirt and examined his chest underneath the ballistics vest and observed "a large amount of redness on his shoulder area."

Sergeant Garrett testified that after a period of negotiating with his pastor, the

_____

[1]This individual's surname is spelled "Mackey" in the indictment and "Mackie" in the transcript. As is the policy of this court, we utilize the spelling in the indictment.

defendant surrendered and "was apprehended peacefully." When officers entered the defendant's house, they observed "a small kitchen-like table, and it had two guns on it pointing out the window." Officers observed a camouflage jacket on the floor.

Deputies Mackey and Ledbetter confirmed Sergeant Garrett's recitation of the day's events. Deputy Ledbetter added that Vida Clark's body was quite hot and that when he "grabbed her, it was just warm and like, you know, just real jelly feel."

Agent Greg Whittaker of the State of Tennessee Bomb and Arson Unit testified that he was called to investigate the fire at 141 Hassler Road. He said that after a brief period of consultation with the other officers on the scene and fellow agent Craig Frost, the larger scene was divided into three crime scenes: 141 Hassler Road, 135 Hassler Road, and the female victim's body. Agent Whittaker began his investigation by walking around the fire "trying to develop fire patterns, and looking at the damage to the residence to determine where the fire could have possibly originated." As he circled the residence, he saw "numerous shotgun shells located on the outside of the residence." After this preliminary examination, he began to process the scene "from the area of less damage to the area of the greatest damage." The right side of the residence bore the most damage. As he conducted his investigation, he created a video of the scene that was played for the jury.

Agent Whittaker said that he found the bodies of a human and a dog in the kitchen area of the burned home. The body had suffered severe fire damage. Agent Whittaker determined that the fire originated on the right side of the house. He said that "an unusual burn pattern on the exterior of the residence" was consistent with the use of an accelerant to start the fire.

At the defendant's residence, officers recovered "gasoline found in some quart jars, along with some foam-type products commonly associated with maybe some type of incendiary device itself." Based upon his investigation, Agent Whittaker concluded that the fire was "an incendiary fire. It is a set fire." He said that "[t]here was no way" that the fire could have started at its point of origin "other than being set." No other possible sources of the fire existed.

Tennessee Bureau of Investigation ("TBI") Agent Steve Huntly responded to a call from the Overton County Sheriff to investigate the crimes on Hassler Road. Agent Huntley said that he headed the investigation and took a primarily administrative role. Agent Huntley recovered the Ruger 10/22 and Winchester pump-action 12-gauge shotgun from the defendant's residence. He also collected the defendant's jacket for testing and found "shot shells" and one slug in the pocket. Agent Huntley took possession of those items collected by other agents during the investigation at 141 Hassler Road. After officers finished

processing the three scenes, Agent Huntley went to the medical examiners office, where he collected shotgun pellets recovered from Vida Clark's arm and from Roy Clark's abdomen. He also collected the defendant's clothing and boots from the jail. Agent Huntley took all of the collected evidence to the TBI laboratory for testing.

TBI Agent Billy Miller testified that he was called to assist Agent Huntley in the investigation. At the Hassler Road scene, Agent Miller manned a table where evidence was processed as it was collected. After arson investigators finished examining the inside of the 141 Hassler Road residence, he completed the exterior processing of that scene. During that processing, Agent Miller discovered "a casing from a 12-gauge spent round" on the right side of the crime scene, another on the left side, and other partially-intact 12-gauge shell casings on the ground. He also found the "skin" to a metal door that bore a "gash to the right of the doorknob." There were also holes in the doorknob itself as well as holes in a dent in the door. Forensic examination established that the shells had been fired from the shotgun recovered from the defendant's residence.

TBI Agent and Firearms Identification Expert Steve Scott testified that he examined a 12-gauge shotgun and a .22-caliber rifle taken from the defendant's residence as well as a number of "shotshell" cases and .22-caliber cartridge cases. He said that the birdshot pellets obtained from the victims at autopsy were "consistent, or within the size and weight specifications of" those shotshells he determined had been fired by the 12-gauge shotgun. He also examined a window screen and determined that a hole in the screen was caused by a shotgun blast with the muzzle of the gun aimed less than five feet away from the screen.

TBI Special Agent and Forensic Scientist Randall Curt Nelson testified that he analyzed three vials of liquid obtained from the defendant's residence and determined them to be "gasoline-range products." Forensic analysis of the defendant's jacket, boots, and clothing "revealed the presence of an evaporated gasoline range product." Testing also revealed the presence of an evaporated gasoline-range product on a piece of pipe foam taken from the defendant's residence. During cross-examination, Agent Nelson admitted that he could not quantify the amount of the substance that was on any of the items.

TBI Special Agent and Forensic Scientist Robert T. Miles, III, testified that he examined the defendant's jacket, boots, and clothing for the presence of gunshot residue. He found the residue on all three items.

Doctor Thomas Deering, the forensic pathologist who performed the autopsies of Vida and Roy Clark, testified that Roy Clark's body had "been burned to a point that portions of the body had started to disintegrate because of the burning." In fact, the feet had

been burned off the body completely and part of the skull had burned away, exposing Roy Clark's brain. In addition, "the body had also been injured by a shotgun wound." Based upon the location of the wound and the pellets inside Roy Clark's body, Doctor Deering determined that Roy Clark was shot in the back left flank. Pellets from the shotgun blast lacerated Roy Clark's spleen, left kidney, liver, diaphragm, pancreas, and "the mesentery of the intestines, which is where the vessels run to support all of the intestines." Doctor Deering said that the absence of soot from Roy Clark's airways established that he did not breathe the smoke from the fire. Additionally, the level of carbon monoxide in his blood was akin to that of a heavy smoker but not at a level consistent with his being alive during the fire. Doctor Deering determined that the cause of Roy Clark's death was a shotgun wound to the abdomen.

Doctor Deering testified that Vida Clark suffered "at least two, and maybe stray pellets from more than two" shotgun wounds. In addition, she had "thermal injuries" to her head, torso, legs, and right forearm. A shotgun wound to the back of the left side of her neck injured her vertebrae and spinal cord, and "some of the pellets exited, and they came out her mouth, knocking out the teeth, lacerating the lips and the face around the mouth." The second entrance wound was on the back of the left arm, and it followed a downward trajectory. Doctor Deering said that Vida Clark also had a number of "separated pellet holes, kind of scattered across the back." He said that these wounds could have come from the blast to her arm or from another blast altogether. Doctor Deering characterized the wound to Vida Clark's neck as lethal. He said that it would have been impossible for Vida Clark to call 9-1-1 after suffering that wound because it nearly severed her spinal cord and did sever the left vertebral artery as well as fracture her jaw, break her teeth, and seriously injure her lips and tongue. He said that she would have fallen immediately after being shot and would not have been able to move. Vida Clark's blood contained an elevated level of carbon monoxide, indicating that she lived long enough to breathe the smoke from her burning home.

At the conclusion of this testimony, the State rested. Following a *Momon* colloquy, *see State v. Momon*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify and chose not to present any proof. The jury convicted the defendant of the first degree premeditated murder of Vida Clark, the first degree premeditated murder of Roy Clark, the felony murder of Vida Clark in the perpetration of the murder of Roy Clark, the felony murder of Vida Clark in the perpetration of burglary, aggravated arson, abuse of a corpse, the aggravated assault of Deputy Mackey, the aggravated assault of Sergeant Garrett, and the lesser included offense of reckless endangerment on that count charging the attempted first degree murder of Deputy Ledbetter. The trial court merged the convictions of the felony murder of Vida Clark into the conviction of the premeditated murder of Vida Clark. The trial court imposed the automatic sentence of life for each first degree murder conviction, and, after a sentencing hearing, the court ordered the life sentences to be served

consecutively to one another. The court ordered the sentences for the remaining offenses to be served concurrently to the consecutive life sentences.

The defendant filed a timely but unsuccessful motion for new trial, alleging, inter alia, that the trial court erred by admitting into evidence the videotaped deposition of Mr. Brockette, that the trial court erred by admitting into evidence the results of forensic examination of the defendant's clothing and boots, and that the evidence was insufficient to support his convictions. In this appeal, the defendant again raises these three issues. We consider each in turn.

## I. Deposition Testimony of William Brockette

The defendant avers that the trial court erred by permitting the State to depose Mr. Brockette prior to trial and that the admission into evidence of Mr. Brockette's videotaped deposition violated his constitutional right to confront the witnesses against him. The State contends that the trial court did not err by permitting the taking of the deposition but concedes that admission of the deposition into evidence violated the defendant's confrontation right. The State insists, however, that the error can be classified as harmless beyond a reasonable doubt.

### A. Taking the Deposition

Prior to the defendant's trial, the State moved for leave to depose Mr. Brockette to preserve his testimony, which the State deemed "material" to its case against the defendant, on grounds that Mr. Brockette's attendance at trial would place him in a precarious financial position. In its motion, the State relayed that Mr. Brockette "had voiced concerns" about appearing at trial "due to difficulties with his employment." The State explained that the witness, an over-the-road trucker, performed a "dedicated haul" each week, driving to California beginning on Wednesday and returning to Tennessee on Sunday. Because of his schedule, his appearing at trial would cost him an entire week's work and would "pose a great financial difficulty for him."

The defendant filed an objection to the taking of Mr. Brockette's deposition, arguing that "the circumstances surrounding the potential witness's testimony do not satisfy the requirements of Rule 15" and that "a deposition of a material witness" would violate the defendant's right to confront the witnesses against him.

In response, the prosecutor filed an affidavit indicating that the State had been unable to serve Mr. Brockette with a subpoena to testify at trial and that it appeared that Mr. Brockette was "actively avoiding service of process." The prosecutor stated that Mr.

Brockette had attempted to make arrangements with his employer, but none could be made, and that his missing an entire week of work would cause "great personal sacrifice" to both Mr. Brockette and his partner, who was "close to having his home foreclosed." The prosecutor said that Mr. Brockette had advised the State that he would not appear for the scheduled trial but would agree to appear for a deposition three days before the scheduled trial date.

On the following day, the trial court entered an order granting the State's motion, finding that Mr. Brockette was "a material witness for the State" and that "exceptional circumstances exist[ed] justifying the taking of the deposition." The Court denied the State's motion to continue the trial.

Tennessee Rule of Criminal Procedure 15 governs the taking of depositions in criminal cases. That rule provides, in pertinent part, that "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may . . . grant the motion because of exceptional circumstances." Tenn. R. Crim. P. 15(a). The rule does not define "exceptional circumstances," and neither this court nor our supreme court has undertaken to define the term. Our supreme court has deemed a witness's military service "exceptional circumstances," and the resulting unavailability justification for the taking of the witness's deposition and its later use at trial. *State v. Simon*, 635 S.W.2d 498, 504 (Tenn. 1982). A witness's medical condition has also been deemed "exceptional circumstances" under Rule 15. *State v. Powers*, 101 S.W.3d 383, 398 (Tenn. 2003). This court has expressed doubt that a witness's vacation plans, *see State v. Coulter*, 67 S.W.3d 3, 59 (Tenn. Crim. App. 2001), or a witness's impending relocation to Saudi Arabia, *see State v. Jeffrey Scott Gold*, No. E2012-00387-CCA-R3-CD, slip op. at 13-14 (Tenn. Crim. App., Knoxville, Aug. 15, 2013), qualified as "exceptional circumstances" under the terms of the rule. Other cases, although not addressing the propriety of the taking of a deposition, have noted that depositions were taken to preserve the testimony of a witness incarcerated in another state, *see State v. Marlow Davis*, No. W2011-01548-CCA-R3-CD (Tenn. Crim. App., Jackson, May 21, 2013), and a witness suffering from end stage lung cancer, *see State v. Justin Brian Conrad*, No. M2008-01342-CCA-R3-CD (Tenn. Crim. App., Nashville, Sept. 29, 2009).

With these cases as our guide, we conclude that the State failed to establish that "exceptional circumstances" warranted the taking of Mr. Brockette's deposition in this case. At bottom, Mr. Brockette's complaint was that his appearance at trial would force him to miss work and incur financial difficulties as a result. Many, if not most, witnesses must miss work to testify at trial. Were we to conclude that missing work constituted exceptional circumstances under Rule 15, then any witness whose appearance at trial subjected them to missed work would be subject to deposition.

Although we have concluded that the trial court erred by permitting the State to depose Mr. Brockette, the defendant has failed to establish that he was prejudiced by the erroneous ruling. Mr. Brockette's testimony, although quite damaging to the defendant, was not the only proof that the defendant premeditated the murders of his mother and brother. Indeed, the evidence of the defendant's premeditation was overwhelming.

### B. Admission of the Deposition

The defendant contends that the admission of Mr. Brockette's videotaped deposition violated the terms of Rule 15 and his constitutional right to confront the witnesses against him. The State concedes that admission of the deposition violated the defendant's constitutional rights but argues that the error was harmless beyond a reasonable doubt.

Rule 15 provides:

At the trial or in any hearing, a party may use a part or all of a deposition-otherwise admissible under the Tennessee Rules of Evidence-as substantive evidence if:

(A) the witness is unavailable as defined in Rule 15(h); or

(B) on motion and notice, the court-in the interest of justice with due regard to the importance of presenting the testimony of witnesses orally in open court-finds such exceptional circumstances exist that make it desirable to allow the deposition to be used.

Tenn. R. Crim. P. 15(f)(1).

Unavailability of a witness under Rule 15(f) means situations in which the declarant:

(A) is exempted by court ruling on the ground of privilege from testifying concerning the subject matter of the declarant's statement;

(B) persists in refusing to testify concerning the subject matter of the declarant's statement despite a court order to do so;

(C) demonstrates a lack of memory of the subject matter of the declarant's statement;

(D) is unable to be present or to testify at the hearing because of the declarant's death or then existing physical or mental illness or infirmity; or

(E) is absent from the hearing and the party seeking to introduce the declarant's statement has been unable to procure the declarant's attendance by process or other reasonable means.

Tenn. R. Crim. P. 15(h)(1).

In this case, the trial court made no finding that Mr. Brockette was unavailable before permitting the State to utilize his videotaped deposition at trial. The State indicated via the affidavit of the prosecutor that Mr. Brockette was "actively avoiding" service of process, however, the State remained in communication with the witness throughout the proceedings. Nothing in the record establishes that Mr. Brockette was unavailable under the terms of Rule 15. Accordingly, the trial court erred by admitting the videotaped deposition into evidence at trial. As we have indicated, however, admission of the deposition was harmless.

The defendant also contends that admission of the deposition violated his Confrontation Clause rights. As this court has observed, "any interpretation of Tenn. R. Crim. P. 15 must be made against the backdrop of constitutional protections that inhere in the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 1, Section 9 of the Tennessee Constitution." *Coulter*, 67 S.W.3d at 59. "'The deposition[, even when videotaped,] is a weak substitute for live testimony, a substitute that the Sixth Amendment does not countenance on a routine basis.'" *Id.* (quoting *Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir. 1993)). Indeed, "the particular vice that gave impetus to the confrontation claim was the practice of trying defendants on 'evidence' which consisted solely of ex parte affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter *in front of the trier of fact*." *California v. Green*, 399 U.S. 149, 156 (1970) (emphasis added).

The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court "'has largely adopted the standards used by the United States

Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'" *State v. Parker*, 350 S.W.3d 883, 897-98 (Tenn. 2011) (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006)); *see also State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007).

In *Crawford v.Washington*, 541 U.S. 36 (2004), the United States Supreme Court departed from decades' long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability *and* a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68 (emphasis added). "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* In *Crawford*, the Court laid the groundwork for what came to be known as "the primary purpose" test for distinguishing testimonial statements from non-testimonial statements. The Court refined the test in later opinions:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). The Court noted that objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or non-testimonial. *Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011).

The State concedes that Mr. Brockette's videotaped deposition was testimonial and that its use at his trial violated his constitutional rights. We agree. The deposition was clearly prepared for use at trial. Thus, the State was required to establish that Mr. Brockette was unavailable and that the defendant had a prior opportunity to cross-examine him. We have already concluded that the State failed to establish that Mr. Brockette was unavailable under the terms of Rule 15, and we similarly conclude that he was not unavailable for purposes of the Confrontation Clause.

Mr. Brockette lived within the jurisdiction, and he remained in constant contact with the district attorney's office. Although the prosecutor indicated that Mr. Brockette was "actively avoiding" the service of process, the State did not establish that it had exhausted

all reasonable means to secure his attendance at trial. *See Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (quoting *Barber v. Page*, 390 U.S. 719,724-25 (1968) ("The basic litmus of Sixth Amendment unavailability is established: '[A] witness is not 'unavailable' for purposes of . . . the exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial.'" (emphasis added)). In fact, Mr. Brockette expressed a willingness to testify but quibbled with the dates of the defendant's trial.

Because the State failed to establish that Mr. Brockette was unavailable, the admission of his videotaped deposition violated the defendant's Confrontation Clause rights. That being said, we view the admission of the deposition to be harmless beyond a reasonable doubt. *See Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, *see e.g.*, *Delaware v. Van Arsdall*, 475 U.S. [673, 679, 684 (1986)], and see no reason why denial of face-to-face confrontation should not be treated the same."). As we have said, Mr. Brockette's testimony certainly tended to establish that the defendant premeditated the murders in this case, but it was not the only evidence that supported a finding of premeditation. We have no hesitation in concluding that, even absent Mr. Brockette's testimony, the outcome of the defendant's trial would have been the same.

## II. Chain of Custody

The defendant next contends that the trial court erred by admitting the results of forensic testing conducted on his clothing and boots, claiming that the State failed to establish an adequate chain of custody for these items. Specifically, he asserts that because the State failed to call as a witness the jail employee who placed the defendant's clothing into a bag at the jail, the State failed to establish an unbroken chain of custody. The State avers that the trial court did not err by admitting the evidence.

"Whether the requisite chain of custody has been established to justify admission . . . is 'a matter committed to the discretion of the trial judge and [t]his determination will not be overturned in the absence of a clearly mistaken exercise thereof.'" *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 267 (Tenn. 2009) (quoting *Shell v. Law*, 935 S.W.2d 402, 409 (Tenn. Ct. App. 1996)). Accordingly, this court will not reverse the trial court's ruling on the chain of custody "unless the trial court 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Although "it is 'well-established that as a condition precedent to the

introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody,'" *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)), the general rule "does not require that the identity of tangible evidence be proven beyond all possibility of doubt," *id.* The State need not "call all of the witnesses who handled the item." *Id.* (citing *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). So long as the State can "reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.*

Here, jailer Travis Cline testified that he processed the defendant into the Overton County Jail after his arrest. As part of that process, Mr. Cline had the defendant remove his clothing and boots and don a jail-issued jumpsuit. Mr. Cline testified that he gave the defendant's clothing and boots to a jail employee named Teresa or Tessa McKelvy. Mr. Cline said that he saw Ms. McKelvy place the items into a paper bag, and he identified the bag and Ms. McKelvy's signature on the bag. Agent Huntley collected the bag, in its original condition and bearing Ms. McKelvy's signature, and took it to the TBI laboratory, where Agent Miles opened it and removed the items for forensic examination. No evidence suggested that either the bag or the items had been tampered with in any way. Although Ms. McKelvy did not testify at trial, the other evidence presented sufficiently established the chain of custody of the defendant's clothing and boots, and the trial court did not err by admitting the evidence or the testimony regarding the tests performed on them.

### III. Sufficiency

Finally, the defendant challenges the sufficiency of the convicting evidence for his convictions of first degree premeditated murder, claiming that the State failed to establish premeditation.[2] The State contends that the evidence was sufficient to support the convictions.

We review the defendant's challenge to the sufficiency of the evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither

---

[2]The defendant does not challenge the sufficiency of the convicting evidence for his other convictions, including the convictions of the first degree felony murder of Vida Clark.

-14-

re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006).

As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

In this case, the evidence established that the defendant, angry about the construction of a fence across the driveway to his house, told Mr. Brockette that he would kill his mother and brother if the fence remained when he finished work. When the

-15-

defendant returned home, he outfitted himself in a field jacket and boots and armed himself with a 12-gauge shotgun and a .22-caliber rifle. He then went to the house his mother, Vida Clark, shared with his brother, Roy Clark, where he gained entry by firing the shotgun at the doorknob. Once inside, he shot Roy Clark once from behind, inflicting a fatal wound to Roy Clark's abdomen. He then shot Vida Clark once in the arm and then a second time in the back of the neck. At some point, the defendant used gasoline to set fire to Vida Clark's house. After killing the victims and setting the house ablaze, the defendant returned to his home, where he telephoned his wife to say that he had taken care of the issue with the fence and that authorities would never "take him alive." When police arrived, the defendant fired upon them from his position inside his residence. After a period of negotiation, the defendant surrendered to police. The defendant's planning, use of a weapon on the unarmed victims, and calmness after the killings all support a finding that he premeditated the murders of Vida and Roy Clark. As such, the evidence was sufficient to support his convictions of first degree premeditated murder.

*Conclusion*

The trial court erred by permitting the State to depose Mr. Brockette, and the admission of his videotaped deposition violated both Tennessee Rule of Criminal Procedure 15 and the Confrontation Clause. The error, however, can be classified as harmless beyond a reasonable doubt given the overwhelming proof of the defendant's guilt. The State established a sufficient chain of custody for the defendant's clothing and boots. Finally, the evidence was more than sufficient to support the defendant's convictions of the first degree premeditated murder of Vida and Roy Clark. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE